[No. 37982.  Department One.  October 14, 1965.]

THE STATE OF WASHINGTON, *Respondent*, v. DONALD L. VELASQUEZ, *Appellant*.*

*Robert G. Griffin* (of *Johnson, Griffin, Boyle & Ross*), for appellant.

*John G. McCutcheon* and *Eugene G. Olson*, for respondent.

HALE, J.—The sheriff's deputies had seen Donald Velasquez enter and leave the house "many, many times." Just three weeks earlier, one of them watched Velasquez enter the house at 2 a.m. and remain inside past 6 a.m. He believed Donald Velasquez lived there and swore to that belief when he applied for a warrant to search the house. Donald Velasquez not only vehemently denied the house to be

*Reported in 406 P.2d 772.

his residence, but in the afternoon of July 29, 1964, violently tried to prevent their search of the building.

The sheriff's two detectives went to the front door, knocked, identified themselves, and asked Louise Johns if Donald Velasquez was there. She said no; the deputies said they had a warrant to search the house. They stood at the front door and read her the warrant. Then, while explaining it to her, they saw Donald Velasquez come out of the bedroom, walk through the front room, and directly to the front door. Louise Johns stepped aside as Velasquez confronted the sheriff's two deputies.

The officers again identified themselves as sheriff's deputies Patrick L. Keogan and Henry E. Suprunowski, and read the search warrant to Velasquez, a part of which said:

> Pat Koegan verily believes that the said goods, or a part thereof, are concealed in or about the house of Donald Velasquez, 6135 So. M. Street, Tacoma in said County.
>
> THEREFORE, In the name of the State of Washington, you are commanded that with the necessary and proper assistance you enter into the house of said Donald Velasquez, 6135 So. M Street, Tacoma, and there diligently search for the said goods and chattels, and if same or any part thereof be found on such search, you will bring the same, and also the said Donald Velasquez forthwith before me to be disposed of according to law.

Velasquez said that he did not live there, that he lived elsewhere; he forbade the search. Officer Keogan told him that they intended to execute the search warrant, that it was a command from a court to search the house. Velasquez became insistent and raised his voice, volubly proclaiming that he would not allow a search. He suddenly grabbed the search warrant from Officer Keogan's hand and tried to slam the door closed. Keogan braced his shoulder against the door to force it open, and his momentum carried him into the living room.

Velasquez jumped on Keogan's back and Suprunowski, to protect his partner, took an arm lock around Velasquez' neck, pulling all three back out through the front door into the patio. Velasquez yelled to Louise Johns to close

and lock the door, and she did so. They grappled and wrestled on the ground for several moments.

After a brief struggle, the officers got Velasquez under control and, while still holding him, started to handcuff him. He pleaded with them not to do this saying that he could not stand to be tied up and would give them no more trouble. The officers said they would refrain from handcuffing him but told him again that they would search the house. Velasquez again said that he would not permit them to search the premises. Whereupon, the officers told him that he was under arrest for disorderly conduct and ordered him into and to stay in the patrol car.

Officer Suprunowski stepped into the back seat of the car as Keogan walked toward the front door of the house. Velasquez slid out of the car quickly and picked up a large rock. Officer Suprunowski jumped out of the other door, drew his pistol, and ordered the defendant to drop the rock and get back in the car. He then radioed for another patrol unit to come and take Velasquez to jail.

While waiting for the other unit to arrive, defendant cursed the officers, threatened them with reprisal, and told them again and again that he did not live in the house and that they could not search it.

Then, when told that they intended to search the house under the warrant and would force the door if necessary to gain entrance, he called to Louise Johns to open the door for the officers and let them in.

As other officers drove off with Velasquez, Officers Keogan and Suprunowski returned to the house. Louise Johns unlocked the front door, admitted them, and they searched the house.

In the master bedroom closet, they found a small coin changing mechanism, some metal devices referred to as trip levers, a sack containing a quantity of coin wrappers, four coils of piano wire similar to the filler core in the trip levers, and 11 lock-pick tools and pressure bars.

In a dresser drawer, they found an instrument called an "Ace joint," a kind of lock pick used to open round barrel locks. In a vase they located an assortment of copper, brass

and aluminum washers and some coin-shaped discs called "slugs." The master bedroom closet had women's clothing on one side and men's on the other. The bedroom dresser's contents were similarly divided.

They also discovered a coin changing machine—a large console model usually located in places where a number of vending machines are kept. It proved to have been stolen from the Greyhound Bus Depot in Seattle where it had been made available for customers using the vending machines there. A .22 pistol was found between the mattresses in the master bedroom and a box of shells under a mattress in another room.

By amended information, the prosecuting attorney for Pierce County charged Donald L. Velasquez in count 1 with grand larceny in possessing and concealing stolen property (RCW 9.54.010(5)); with unlawful possession of burglary tools in count 2 (RCW 9.19.050), and in count 3 with assault in the second degree in forcibly trying to prevent the officers from executing the search warrant (RCW 9.11.020(6)).

Convicted by a jury on each count, defendant brings this appeal from the judgment and sentence entered on the verdict. He makes four assignments of error which merge to present one question concerning admissibility of the search warrant and allowing certain evidence tags to remain on exhibits received in evidence. Since both the objection to the search warrant and the tags on the exhibits relate to the statements concerning the address of Donald Velasquez, we will consider them together.

Defendant objected to placing exhibit No. 1, the search warrant, in evidence because he said it described the place to be searched as his residence—one of the very facts in issue. The search warrant recited that

Pat Koegan verily believes that the said goods . . . are concealed in or about the house of Donald Velasques, 6135 So. M. Street.

The other assignments of error to be discussed concern police identification tags attached to four exhibits received in evidence. On each of the four tags there had been

printed in pen and ink in the blank spaces after the printed words, such phrases as: *Name*: Donald Velasquez; *Address*: 1305 East 60th, Tacoma Wash.; *Charge*: possession of burglary tools; *Where found*: closet of master bedroom at above address.

■ As to the search warrant, it became admissible under the circumstances to show that the officers were not only purporting to make a lawful search under judicial authority, but had read the warrant aloud to communicate this idea to the occupants of the house. Then, prima facie showing having been made to the defendant that a search of the premises would be made under judicial authority, the warrant became material to the question of the defendant's occupancy, control or possession of the premises when he forcibly resisted the search. And, thirdly, the warrant was proper evidence to the state's case in proving count 3, assault on the officers engaged in executing a lawful writ.

That the warrant described the premises as being in the belief of Pat Keogan "the house of said Donald Velasquez, 6135 So. M" was neither prejudicial nor damaging. It did no more than assert in formal legal language essentially the same belief expressed in the information wherein Velasquez stood accused.

We do not say that the warrant would have been admissible had there been no evidence of resistance to the search nor an assault pursuant to such resistance, but do hold that it was properly admitted under the circumstances described.

As to the identifying tags attached to the four exhibits, the court, after hearing argument, cautioned the jury:

> The jury is instructed the only purpose of the tag is to identify this particular exhibit. You are not to accept anything on the tag other than the identification, as to being the one the officer says he found.

and, later, in its formal charge to the jury:

> You are instructed that any writing on any exhibit and/or card marking an exhibit is not evidence of the

defendant's residence and shall not be used by you as evidence to determine his residence. (Instruction No. 24.)

The tags contained merely identifying data and, aside from implying that the items of evidence had been found at a stated address in a search connected with an investigation relating to Donald Velasquez, obviously had no function other than to enable the officers to identify the items when putting them into and removing them from the sheriff's evidence lockers and subsequently producing them in court. The practice of leaving anything on the exhibit except the court's identifying marker is not recommended; and the better practice in this case would have been to remove the sheriff's identification tags. But in the light of the court's explicit instruction that they were not to be viewed as anything but identifying marks, and the abundant evidence connecting the defendant with some possessory dominion and control over the premises, we consider them as having no probative effect in this case and, therefore, deem them harmless.

We do not, of course, depart from the firmly held rule that a party may not bolster his testimony by placing written transcriptions thereof in evidence (*State v. Gregory*, 25 Wn.2d 773, 171 P.2d 1021 (1946)), but see no parallel between the identification tags and a written transcription of oral evidence. Only by the most extreme construction could the tags be said to have a testimonial content; on their face they appear to be merely identifying devices.

Judgment affirmed.

ROSELLINI, C. J., DONWORTH, OTT, and HUNTER, JJ., concur.